IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROBERT M. CLEMMONS, ) | CIVIL. NO. 10-00513 SOM/BMK |
| ) | |
|       Plaintiff, ) | |
| ) | ORDER GRANTING DEFENDANTS' |
|    vs. ) | MOTION FOR SUMMARY JUDGMENT |
| ) | AS TO PLAINTIFF'S CLAIMS IN |
| HAWAII MEDICAL SERVICES ) | COUNTS I, II, AND III OF THE |
| ASSOCIATION, a Hawaii ) | COMPLAINT |
| corporation, KUHIO MEDICAL ) | |
| CENTER, a Hawaii corporation, ) | |
| HAWAII FAMILY MEDICAL ) | |
| CENTERS, a Hawaii ) | |
| corporation, INTEGRATED ) | |
| SERVICES, INC., a Hawaii ) | |
| corporation, DIANE KENT, and ) | |
| DOES 1-20, ) | |
| ) | |
|       Defendants. ) | |
| _____ ) | |


ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF'S CLAIMS IN COUNTS I, II, AND III OF THE COMPLAINT

I.        INTRODUCTION.

On September 2, 2010, Plaintiff Robert M. Clemmons

("Clemmons") filed a complaint against Defendants Hawaii Medical

Services Association ("HMSA"), Kuhio Medical Center ("KMC"),

Hawaii Family Medical Centers ("HFMC"), Integrated Services, Inc.

("ISI"), and Diane Kent ("Kent") (collectively "Defendants"),[1]

alleging gender and race discrimination under Title VII of the

_____

[1]Defendants Kent and KMC were previously dismissed from
this action.  See Order Granting Defs.' Mot. To (1) Dismiss Pl.'s
Compl. Against Diane Kent, (2) Dismiss Count IV, And (2) Strike
Para. 69 And 70 Of The Compl., Jan. 28, 2011, ECF No. 32 ("Order
Granting Motion to Dismiss").

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), breach of contract, and negligence. Clemmons alleges that the staff at KMC discriminated against him because of his gender and race and that he suffered retaliation because of complaints he made to supervisors. Conversely, Defendants contend that Clemmons cannot prove a prima facie case of discrimination and that Clemmons was terminated because of patient complaints and a breach of patient confidentiality.

The court previously dismissed Clemmons's claim for negligence and struck references in his Complaint to age and national origin discrimination. See Order Granting Motion to Dismiss, ECF No. 32. Defendants now move for summary judgment against Clemmons on all remaining claims. For the reasons discussed herein, the motion is GRANTED.

II.     BACKGROUND FACTS.

Clemmons is a Caucasian male who was 55 years old at the time he resigned in lieu of being fired in 2009. Beginning in August 1993, Clemmons was employed by HFMC at KMC on the island of Kauai, State of Hawaii. See Compl. ¶ 2, ECF No. 1. HFMC is a wholly owned ISI subsidiary. ISI is a wholly owned HMSA subsidiary. Clemmons alleges that he was constructively discharged on or about April 8, 2009. Id. at ¶¶ 1-2, 24.

Clemmons suffers from macular degeneration in both eyes. Id. at ¶ 4. This disability, he alleges, did not impair

his ability to perform his duties.  <u>Id.</u>

Clemmons alleges that, while employed at KMC as a radiology technician, he was "subjected to constant verbal harassment and derogatory comments" from female, nonwhite clinic staff regarding his gender, race, marital status, and disability. <u>Id.</u> at ¶ 2.  He also alleges that he was treated differently by being required to perform menial tasks not requested of female employees, such as cleaning up bathroom messes or carrying boxes from a manager's car.  <u>Id.</u>  Clemmons alleges that he nevertheless received regular salary increases and favorable employment reviews until Kent became his manager.  <u>Id.</u> at ¶ 13.

According to Clemmons, upon becoming his manager at some unstated time, Kent "increased the pattern of discriminatory conduct."  <u>Id.</u> at ¶ 2.  Clemmons alleges that Kent reduced Clemmons's scheduled annual pay raise even though there was no problem with his employment, while not reducing female, nonwhite employees' pay raises.  <u>Id.</u> at ¶ 20.  Clemmons alleges that Kent denied pay to Clemmons for overtime work, altered his overtime cards, and made it difficult in various other ways for him to obtain overtime, while not doing the same to female, nonwhite employees.  <u>Id.</u> at ¶ 21.

Clemmons says that Kent told him in front of other employees that he was not as smart or experienced as the female, nonwhite employees and that he would always be an outsider.  <u>Id.</u>

at ¶ 2.  He alleges that Kent also made derogatory remarks in front of employees and patients about Clemmons's disability, his ability to see, and the effect of his disability on his ability to work.  Id. at ¶ 23.  According to Clemmons, Kent told him to "come up to our level," which he interpreted to mean the level of nonwhites.  See Decl. of Robert M. Clemmons In Supp. Of His Opp'n To Def.'s Mot. For Summ. J. ("Clemmons Decl.") ¶ 20, ECF No. 93.

Clemmons alleges that Kent sexually harassed him by making inappropriate comments regarding his marital status and his wife and by sitting uncomfortably close to him.  Compl. ¶ 22, ECF No. 1.  For example, he alleges that Kent "jealous[ly] . . . degrad[ed] him for politely saying goodbye to a departing female intern."  Id. at ¶ 26.

According to Clemmons, he complained to HMSA management about Kent's inappropriate conduct.  He alleges that Kent retaliated by excluding him from company activities, falsely accusing him of sexually harassing female patients, and, ultimately, setting Clemmons up so he would be forced to resign. Id. at ¶¶ 2-3, 25.

Clemmons alleges that he complained about Muriah Aquino, the head nurse, who was also supervised by Kent. Clemmons stated that on March 20, 2009, Aquino yelled at him in front of two patients that his "eyes are junk" and that he "mixed up the patient orders again[.]"  See Clemmons Decl. at ¶ 31, ECF

No. 93.  Clemmons then complained to Kent about Aquino's
behavior, but Kent allegedly took no action.  Id.  Clemmons filed
a complaint with the State of Hawaii Regulated Industries
Complaint Office ("RICO"), which looked into the matter but was
unable to assist because his complaint did not involve a
violation of licensing laws.  See Exhibit "6" to Clemmons Decl.,
ECF No. 95-3.  The RICO investigator noted that Clemmons had not
filed a complaint with Kent or KMC and suggested that he might
want to consider filing a complaint with KMC.  Id.

        Two complaints by patients about Clemmons preceded his
termination.  On January 5, 2009, a female patient complained
that Clemmons had made her uncomfortable by taking an excessive
amount of time feeling her chest area, then asking her "how[]
[she got] that body" and if she practiced yoga.  See Defs. Hawaii
Medical Service Association, Hawaii Family Medical Centers, And
Integrated Services, Inc.'s Mot. For Summ. J. As To Pl.'s Claims
In Counts I, II And III Of The Compl. 3, Aug. 17, 2011, ECF No.
51 ("Motion").  After the examination, Clemmons allegedly
approached her in the waiting room, asked her again about her
body, and asked her if she was married.  Id. at 3-4.  HMSA's
human resources department investigated that incident and
credited the patient's account over Clemmons's account.  Id. at
4.  Defendants gave Clemmons a warning on February 26, 2009, and
implemented a new policy requiring Clemmons to present female

patients with a flyer explaining the x-ray procedure and
requiring the presence of a female employee if necessary.  See
Clemmons Decl. at ¶ 28, ECF No. 93.

On March 23, 2009, a second female patient complained
to Defendants about Clemmons.  The patient claimed that when she
hesitated to undress for an x-ray, Clemmons "went ballistic" and
ran in and out of the x-ray room.  See Motion at 5, ECF No. 51.
Clemmons claimed that he sought assistance from female employees
to chaperone the x-ray in accordance with the new policy.  See
Clemmons Decl. at ¶ 33, ECF No. 93.  The patient became
uncomfortable and left without completing her x-ray.  See Motion
at 5-6, ECF No. 51.  Shortly thereafter, Clemmons reviewed the
patient's personal records to retrieve her telephone number and
called her home to provide his version of the events.  Id. at 6.
Defendants say that the patient became scared and disturbed and
notified them on April 2, 2009.  Id.  Defendants again
investigated the complaint and concluded that Clemmons had
engaged in inappropriate behavior, including violating the
patient's privacy.  Id. at 6-7.  Clemmons claimed that he
believed that he accessed the records for a proper business
purpose.  Id. at 7.  Citing the complaints, the assessment that
the inappropriate behavior was likely to continue, and Clemmons's
failure to accept any responsibility for the events, HMSA decided
to terminate Clemmons's employment.  Id. at 7-8.  On April 8,

6

2009, Clemmons was told that he would be terminated as a result of the incident(s), or that he could resign.  Id. at 8.  Clemmons resigned.  Id.

Clemmons asserts claims for racial and gender discrimination in violation of Title VII.  Compl. ¶¶ 30-48, ECF No. 1.  Additionally, Clemmons asserts common law claims for breach of contract and promissory estoppel.  Id. at ¶¶ 49-60.  Clemmons seeks a declaratory judgment and an injunction granting reinstatement, as well as back pay, benefits, compensatory damages, punitive damages, and attorneys' fees.  Id. at 20.

III.     STANDARD OF REVIEW.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

7

admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

One of the principal purposes of summary judgment is to identify

and dispose of factually unsupported claims and defenses.

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that

fails to demonstrate facts to establish what will be an essential

element at trial.  See id. at 323.  A moving party without the

ultimate burden of persuasion at trial--usually, but not always,

the defendant--has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., 210 F.3d 1099,

1102 (9th Cir. 2000).

The burden initially falls upon the moving party to

identify for the court those "portions of the materials on file

that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors

Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp.,

477 U.S. at 323).  "When the moving party has carried its burden

under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986) (footnote omitted).  The nonmoving party may not

rely on the mere allegations in the pleadings and instead must

set forth "specific facts showing that there is a genuine issue

for trial." T.W. Elec. Serv., Inc., 809 F.2d at 630 (quotation omitted).  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  See Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc., 809 F.2d at 631.  Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id.  When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the

9

evidence set forth by the nonmoving party with respect to that
fact." Id.

IV.     ANALYSIS.

Clemmons's remaining claims allege (1) race
discrimination under Title VII, (2) gender discrimination under
Title VII, and (3) breach of contract and/or promissory estoppel.
Because Clemmons fails to make the requisite factual showing to
support his claims, the court grants summary judgment in favor of
Defendants.

A.      Clemmons's Claims Of Discrimination Based On
        Occurrences Before March 10, 2009, Are Time-
        Barred.

Before considering Clemmons's substantive claims, the
court addresses Defendants' argument that the statute of
limitations bars any claims arising out of events that occurred
over 300 days before the filing of the charge with the Equal
Employment Opportunity Commission ("EEOC") and Hawaii Civil
Rights Commission ("HCRC").  "Title VII contains several distinct
filing requirements which a claimant must comply with in bringing
a civil action." Valenzuela v. Kraft, Inc., 801 F.2d 1170, 1172
(9th Cir. 1986), as amended by 815 F.2d 570 (9th Cir. 1987).  A
plaintiff must first exhaust administrative remedies before
bringing a Title VII claim in this court.  Sommatino v. United
States, 255 F.3d 704, 707 (9th Cir. 2001).  A plaintiff does this
by filing a charge with the EEOC.  When a person also files a

charge with a state or local agency, the EEOC charge must be filed "within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1) (2009). See EEOC v. Dinuba Med. Clinic, 222 F.3d 580, 585 (9th Cir. 2000) ("Although ordinarily the administrative charge must be filed within 180 days of the alleged unlawful employment practice, the deadline is extended to 300 days if the charge is initially filed with a state agency that enforces its own anti-discrimination laws.").  This period is not jurisdictional; instead, it is a statute of limitations.  See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

Clemmons filed his charge with the EEOC and the HCRC on or around January 4, 2010.[2]  See Compl. ¶ 16.  Three hundred days before January 4, 2010, is March 10, 2009.  Accordingly, any

---

[2] Defendants note that although the charges were filed on January 4, 2010, the charge filed with the EEOC was signed on December 30, 2009 and December 29, 2009.  Defendants appear to give Clemmons the benefit of the doubt by counting back 300 days from the earlier of the signing dates.  See Motion at 10-11, ECF No. 51.  However, following the plain language of 42 U.S.C. § 2000e-5(e)(1), the court uses the filing date as the operative date.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002) (in interpreting Title VII law, the courts' "most salient source for guidance is the statutory text").

"alleged unlawful employment practice" occurring before March 10, 2009, is time-barred.

In their motion, Defendants identify the adverse actions (other than his termination) alleged by Clemmons during his deposition testimony: (1) he was told to carry heavier objects; (2) he was told to change the water; and (3) he was told to "[c]lean up that mess, meaning when the toilet backs up." Motion at 11, 12 n.6, ECF No. 51. However, Clemmons admitted that these events occurred prior to February 26, 2009. See Pl. Dep. at 259:14-260:1, July 26, 2011, attached as Exhibit "A" to Defs.'s Concise Statement Of Facts In Support Of Mot. For Summ. J., Aug. 17, 2011, ECF No. 52-2. These events, having occurred prior to March 10, 2009, are beyond the 300-day statute of limitations and may not be the bases of Clemmons's claims in this case.

The court is unpersuaded by Clemmons's argument that ongoing harassment saves his untimely claims. First, the court notes that Clemmons does not contest that these alleged adverse actions would otherwise be barred by the statute of limitations. Second, Clemmons still does not allege any adverse action that falls within the 300-day period prior to the filing of this charge with the EEOC and HCRC. Third, Clemmons's assertion of a hostile work environment does not meet the test for establishing a prima facie claim. Notably, he does not allege ongoing

"unlawful employment practices" within the 300-day period that evidence a hostile work environment.[3]  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

As noted by the United States Supreme Court in Morgan, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. at 117.  In that case, an African-American railroad worker brought suit against his employer for racial discrimination.  With respect to his claims for "discrete discriminatory acts," the Supreme Court held that they "are not actionable if time barred, even when they are related to acts allegedly in timely filed charges. . . . The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred."  Id. at 113.  However, with regard to a hostile environment claim, which is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" id. at 117 (citing 42 U.S.C. § 2000e-5(e)(1)), the unlawful employment practice "occurs over a series of days or perhaps years and, in direct contrast to

---

[3] This is not to say that Clemmons could not possibly establish a claim for hostile work environment.  However, the Complaint, while asserting gender discrimination, does not expressly describe the workplace as a hostile environment. Moreover, the record at this time does not reflect the factors necessary to establish a hostile work environment.

discrete acts, a single act of harassment may not be actionable on its own." Id. at 115 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  So long as one act that is a part of the continuing harassment falls within the 300-day period, all acts constituting the "unlawful employment practice" may be considered by the court.  Id. at 117.[4]

---

[4] The Supreme Court expounded upon this distinction:

The following scenarios illustrate our point: (1) Acts on days 1–400 create a hostile work environment.  The employee files the charge on day 401.  Can the employee recover for that part of the hostile work environment that occurred in the first 100 days?  (2) Acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days 101–400. Can the act occurring on day 401 pull the other acts in for the purposes of liability?  In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole.  Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.  On the other hand, if an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

Morgan, 536 U.S. at 118.

14

In this case, even reading the Complaint as including a hostile work environment claim, the court determines that the claim is barred by the applicable statute of limitations. Clemmons conceded in his deposition that the alleged harassment concluded by 2004, over five years prior to the filing of Clemmons's charge with the EEOC and HCRC. See Pl. Dep. at 259:14-260:1, ECF No. 52-2. While Clemmons's counsel argues that he was subjected to snide remarks and teasing after that time, he fails to provide admissible evidence of harassment occurring during the limitation period.

At the hearing on the subject motion, Clemmons argued that, even if the sexual harassment ceased in 2004, retaliatory harassment started around that time. When prompted by the court to identify any form of retaliation before March 10, 2009, that was not time-barred, Clemmons's counsel pointed to (1) statements from co-workers that he was "not as good as [they] are," which he believed implicated his sex and race,[5] (2) "outbursts" in 2007

_____

[5] The court assumes that counsel is referencing Kent's alleged statement that Clemmons needs to "come up to [their] level," which he interpreted as being "racially motivated." See Pl. Dep. at 241:5-9, 260:21-22, ECF No. 52-2. Although Clemmons stated in his declaration that Kent would "[say] this every time [he] complained," he fails to provide any specific dates or circumstances. See Clemmons Decl. at ¶ 20, ECF No. 93. In his deposition, Clemmons testified that Kent made this comment right before he called Defendants' employee hotline, which was in 2005. See Pl. Dep. at 56:15-21, 241:16-20, ECF No. 52-2. The other perceived racially motivated statement, that Clemmons was a "haole," was last made in January 2009. See id. at 262:23-263:6.

and 2009 by Aquino regarding his eyesight, (3) Aquino's flirting with a male nurse and calling him "honey" in 2007, and (4) Kent's alleged whiting out of his overtime records in 2007. With the exception of Aquino's alleged outburst on March 20, 2009, discussed below, these acts occurred before March 10, 2009.[6] Clemmons needs to provide more than just a scintilla of evidence or evidence that is merely colorable to avoid summary judgment. He does not adequately link any of the events occurring before March 10, 2009, to any subsequent retaliation, such that the different events could be deemed one unlawful employment practice. Indeed, Clemmons does not show that the identified events were retaliatory at all such that, tied to more recent events, they could together be deemed what he calls "retaliatory harassment." In light of his failure to meet his burden of tying otherwise time-barred events to a timely retaliation claim, the court determines that events before March 10, 2009, may not serve as the basis for Clemmons's claims, as any such claims are time-barred.

---

[6] Clemmons also refers to ongoing harassment regarding his disability between 2006 and 2009. However, the only disability-related actions he identifies are one instance of allegedly being told that his eyes were "junk" on March 20, 2009, and unspecified instances during which co-workers laughed at him. Given the vagueness of the laughter incidents, Clemmons does not establish harassment based on disability that allows him to reach back further than March 10, 2009.

B.   Clemmons Fails To Raise Any Genuine Dispute Of
     Material Fact As To His Claim For Race And Gender
     Discrimination.

Title VII makes it illegal for an employer "to fail or
refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000e-2(a)(1) (1991).  To prevail
on his Title VII claims, Clemmons must satisfy the three-step,
burden-shifting test laid out in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802 (1973).

First, Clemmons bears the initial burden of
establishing a prima facie case of race or gender discrimination
by a preponderance of the evidence.  This may be done by showing
(1) that Clemmons belongs to a protected class; (2) that he was
performing according to his employer's legitimate expectations,
(3) that he suffered an adverse employment action, and (4) that
other employees not in his protected class with qualifications
similar to his own were treated more favorably.  Goodwin v. Hunt
Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (citing
McDonnell Douglas Corp., 411 U.S. at 802; Sischo-Nownejad v.
Merced Cmty. Coll. Dist., 934 F.2d 1104, 1109 n.7 (9th Cir.
1991)).

Second, if Clemmons establishes his prima facie case,

"the burden then shift[s] to the defendant to articulate nondiscriminatory reasons for the allegedly discriminatory conduct." Goodwin, 150 F.3d at 1220. Defendants do not need to carry their burden by a preponderance of the evidence; they need only give a clear explanation of a nondiscriminatory reason for their actions. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981) (so long as the employer's explanation is "clear and reasonably specific," it need only "articulate--not prove--a legitimate, nondiscriminatory reason for his action").

Finally, if Defendants present a nondiscriminatory reason for their conduct, Clemmons must be given a full and fair opportunity to demonstrate by competent evidence that the reasons articulated by Defendants are in fact a pretext for or a coverup of their discriminatory decision. See Burdine, 450 U.S. at 253; McDonnell Douglas Corp., 411 U.S. at 802-05; Lam v. Univ. of Haw., 40 F.3d 1551, 1559 (9th Cir 1994). Clemmons at all times retains the ultimate burden of persuading the trier of fact that Defendants intentionally discriminated against him. See Burdine, 450 U.S. at 253 (citing Bd. of Trustees of Keene State Coll. v. Sweeny, 439 U.S. 24, 25 n.2 (1978)).

> 1. Clemmons Fails To Make Out A Prima Facie Case For Race And Gender Discrimination.

Under Title VII, a prima facie case has four elements.

Under the first prong, Clemmons must prove that he is a member of a protected class. Although asserting claims for race

18

and gender discrimination, Clemmons attempts to satisfy this prong by arguing that his disability places him in a protected class. See Pl. Robert M. Clemmons' Opp'n To Def. Hawaii Family Medical Centers, And Integrated Services, Inc.'s Mot. For Summ. J. As To Counts I, II, And III Of The Compl. at 15, ECF No. 87 ("Opposition"). Although this may be true, Clemmons's protected status relating to his disability is irrelevant to his claims for race and gender discrimination.[7] The court nevertheless recognizes that Caucasian males, whether a part of the minority or majority, are a protected class under Title VII. Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 659 (9th Cir. 2002) (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-79 (1976)).

Under the second prong, Clemmons must show that he performed his job adequately or satisfactorily. Defendants offer five reasons that he cannot do this:

> (1) Clemmons allegedly had a history of
> misconduct towards female employees at KMC;

---

[7] Although Clemmons makes numerous passing references to his disability, including in his Complaint, he does not actually assert a disability discrimination claim in that pleading. Indeed, the Complaint refers to Title VII but not to the Americans with Disabilities Act, even though the box for disability discrimination was checked on Clemmons's EEOC charge. Questioned during his deposition, Clemmons testified that he was bringing gender and race discrimination claims in his first and second causes of action. Pl. Dep. at 274, 289, ECF No. 52-2. Because Clemmons does not point to anything in the record constituting a disability discrimination claim, the court does not consider the merits of any disability discrimination claim.

(2) Clemmons was written up in connection
with a patient's complaint that Clemmons
spent an inordinate amount of time checking
her chest area and made inappropriate
comments about her body;

(3) Less than a month later, another female
patient complained about Clemmons's behavior
to KMC management;

(4) Clemmons allegedly violated that
patient's privacy by obtaining her personal
telephone number from her confidential
medical records; and

(5) Clemmons allegedly refused, and still
refuses, to take any responsibility for
making either patient feel uncomfortable by
his actions.

Motion at 15-16, ECF No. 51.  Clemmons offers no specific facts

rebutting the above but points to "his length of service, his

skills and other evidence" as showing that there is at least a

question of fact as to whether he "performed his job in a

competent manner."  See Opposition at 16-17, ECF No. 87.

The court does not consider as evidence of Clemmons's

purported failure to perform his job satisfactorily the two

patient complaints that Defendants relied on in offering him a

chance to resign.  If allegedly improper acts underlying an

alleged termination were allowed to satisfy this prong, the test

"would be rendered superfluous in the current scenario and many

other similar employment discrimination cases. . . . [T]he intent

behind this particular prong is to ensure that the employee was

otherwise qualified for the position of employment as it relates

20

to the actual performance of necessary duties and the skills required for the position." Hawn v. Exec. Jet Mgmt., Inc., 546 F. Supp. 2d 703, 717 (D. Ariz. 2008). As it turns out, this court need not determine whether Clemmons satisfies the second prong of a discrimination claim because there is another prong that he clearly does not satisfy.

It is not the third prong that is problematic. The parties agree for purposes of this motion that Clemmons suffered an adverse employment action.

The problem lies with the fourth prong, which requires Clemmons to show that other similarly situated employees not in the same class were treated more favorably. To satisfy this prong for his race discrimination claim, Clemmons must show that non-Caucasian employees who were engaged in similar conduct were treated more favorably. To satisfy this prong for his gender discrimination claim, he must show that female employees engaged in similar conduct were treated more favorably. Similarly situated employees must "have similar jobs and display similar conduct." Vasquez v. County of L.A., 349 F.3d 634, 641 (9th Cir. 2003).

As Defendants point out in their motion and reply, Clemmons has conceded that he is unable to point to similarly situated individuals outside his class who were treated more favorably. See Motion at 16, ECF No. 51; Defs.' Reply Mem. In

Supp. Of Mot. For Summ. J. As To Pl.'s Claims In Counts I, II And III Of The Compl. Filed Aug. 17, 2011 14, Dec. 5, 2011, ECF No. 108. Aside from restating the law, Clemmons also fails to provide any indication of a comparative analysis in his opposition or any facts that create a genuine dispute in this regard. See Opposition at 22-25, ECF No. 87.[8]

At the hearing on this motion, Clemmons offered Aquino. Clemmons essentially claims that when Aquino complained about his conduct, Defendants took no adverse action against her, while he says he was terminated for complaining about Aquino's actions. Clemmons fails to analyze how he and Aquino were similarly situated, other than to state that both he and Aquino were supervised by Kent. In fact, Aquino was his supervisor, so it is difficult to see how she could have been "similarly situated."

Clemmons also referred to three or four other nurses as similarly situated employees, but failed to provide sufficient detail or specific evidence from which it could be concluded that they were similarly situated or treated more favorably. Ultimately, Clemmons has offered no specific examples of

---

[8] Clemmons states that "[t]he question in this case of whether there were similarly situated employees is a difficult one [since] Mr. Clemmons was, for all intent[s] and purpose[s], the only white, the only male, and only one of two older employees." Opposition at 23, ECF No. 87. Clemmons appears to think that the proper analysis compares two similar employees of the same class, i.e., that he must compare himself to another Caucasian male. This is not what is required under the fourth prong. See Aragon, 292 F.3d at 660.

similarly situated employees being treated more favorably. Accordingly, Clemmons fails to make out a prima facie case of race or gender discrimination.

2. Defendants Have Articulated Clearly A Nondiscriminatory Reason For Their Adverse Action Against Clemmons.

Even assuming Clemmons did make out a prima facie case for discrimination, Defendants rebut the presumption in favor of Clemmons by articulating clearly a number of nondiscriminatory reasons for what was, in effect, their termination of Clemmons. The standard Defendants must meet is low:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse action]. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries the burden of production, the presumption raised by the prima facie case is rebutted . . . .

Burdine, 450 U.S. at 254-55 (internal citations omitted). This burden is "satisfied if [the employer] simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" Id. at 256 (quoting Sweeny, 439 U.S. at 25, n.2). Defendants' explanation need only allow the court to rationally conclude that the adverse action was nondiscriminatory. See id. at 257 ("We have stated consistently that the employee's prima

facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decisions had not been motivated by discriminatory animus.").

Defendants have produced admissible evidence demonstrating that Clemmons was terminated for reasons unrelated to his race or gender.  See Motion at 17-21, ECF No. 51.  Two patient complaints--one also allegedly involving a breach of a patient's privacy--closely preceding Clemmons's termination are legally sufficient explanations for the adverse action.  On January 5, 2009, a patient complained to Defendants that Clemmons made her uncomfortable by allegedly taking an excessive amount of time feeling her chest area, then later repeatedly asking her about "how[] [she got] that body."  HMSA's human resources department investigated the incident and found the patient's account more credible than Clemmons's account.  Defendants issued Clemmons a warning on February 26, 2009, and implemented a new policy regarding his interaction with female patients.

Subsequently, on March 23, 2009, Defendants received a complaint against Clemmons from another female patient.  The patient claimed that Clemmons "went ballistic" when she hesitated to remove certain clothing for an x-ray.  The patient became

uncomfortable and left the facility without completing her x-ray.

Approximately a week later, Clemmons got her home telephone

number from her file and called her to explain his version of

events.  The patient became uncomfortable and notified Defendants

on April 2, 2009.  Defendants again investigated the patient's

complaints and concluded that Clemmons had engaged in

unacceptable behavior, including violating patient privacy.

Based on their conclusion that Clemmons's inappropriate behavior

was likely to continue, Defendants say they decided to terminate

Clemmons, but he accepted their offer to resign in lieu of

termination on April 8, 2009.  See Motion at 3-8, ECF No. 51.

        The above explanation offered by Defendants, supported

by declarations and complaint reports, is sufficient to satisfy

Defendants' burden of proof.  See Burdine, 450 U.S. at 256.

Accordingly, the burden shifts back to Clemmons to prove by a

preponderance of the evidence that Defendants' explanation was a

mere pretext for discriminatory action.

> ### 3.   Clemmons Fails To Establish Pretext With
> ###      Respect To The Adverse Action.

        Clemmons does not satisfy his burden of establishing

that Defendants' explanation was a mere pretext for what he

claims was discriminatory action.  Clemmons "may succeed in this

either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of

credence." See Burdine, 450 U.S. at 256 (citing McDonnell
Douglas Corp., 411 U.S. at 804-05).

Clemmons does not directly refute Defendants'
explanation of a nondiscriminatory reason for his termination.
Rather, Clemmons appears to suggest that his assertion that "he
was referred to as an outsider, too blind to do his job, making
mistakes because of his vision, and an inferior employee
relegated to maintenance man[]" suffices as "direct or
circumstantial" evidence that establishes pretext. See
Opposition at 26, ECF No. 87.

Clemmons's arguments are unavailing. First, as noted
above, Clemmons does not state a disability discrimination claim.
Clemmons fails to offer any specific "direct or circumstantial"
evidence to support his argument for pretext related to either
gender or race discrimination. Even if the court were to accept
his allegations, he has offered no specific evidence that raises
an issue of triable fact. At the hearing on the present motion,
Clemmons pointed to his complaint to Kent regarding Aquino just
days before he was terminated. This is not direct evidence of
pretext, and Clemmons has failed to produce anything more than
conjecture that his complaint about Aquino was related to his
termination.

In examining the level of proof of pretext required,
the Ninth Circuit distinguishes between direct and circumstantial

evidence. In both Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007), and Goodwin, 150 F.3d at 1221, the Ninth Circuit states: "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." (Emphasis added.) Clemmons ignores the express limitation to direct evidence and says, "If the plaintiff submits direct or circumstantial evidence, 'a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.' Id. (quoting Goodwin at 1221)." Opposition at 26-27, ECF No. 87 (emphasis added). Goodwin made it clear that more is required when the evidence is purely circumstantial:

> In those cases where direct evidence is unavailable, however, the plaintiff may come forward with circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable. Such evidence of "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex.

Goodwin, 150 F.3d at 1222 (citations omitted) (emphasis added). This distinction was the focus in Goodwin. The Ninth Circuit was attempting to reconcile the "apparently differing standards" for a plaintiff's burden of proof based on the type of evidence presented by the plaintiff. See id. at 1221.

Clemmons has provided no direct evidence of pretext.

Cf. id. (direct evidence of women receiving "Barbie doll kits" with sex toys, exclusion of women from company trips, and derogatory statements toward women by executives). Although Clemmons has offered some circumstantial evidence, it does not meet the necessary standard for creating a triable issue of fact, as it is neither "specific" nor "substantial." Cf. id. at 1222 (indirect evidence through comparison of plaintiffs' credentials and evaluations with another candidate's similar credentials and poor evaluations). The evidence before this court is that the decision to terminate Clemmons's employment was made by Human Resources' personnel and Vice-President Caryn Ireland's supervisor, concurring in Ireland's recommendation. Declaration of Caryn Ireland ¶ 7, ECF No. 52-8. There is no evidence that any of the people involved harbored any racial- or gender-based reason to fire Clemmons. As Clemmons fails to rebut Defendants' nondiscriminatory explanation for his termination, he fails to create a triable issue of fact with respect to his discrimination claims. Defendants' motion for summary judgment as to Counts I and II is granted.

> C.   Summary Judgment On Clemmons's Purported
>       Retaliation Claim Is Warranted.

Although Clemmons refers to retaliation in his Complaint, he did not actually plead a cause of action for retaliation against Defendants. Even reading the Complaint liberally and making appropriate allowances for pleading

28

alternative claims, the court finds his Complaint extremely
confusing on the retaliation issue.  Clemmons appears to be
alleging in the first instance that Kent retaliated against him.
See, e.g., Compl. ¶ 25, ECF No. 1 ("After Mr. Clemmons complained
to HMSA, HFMC, KMC and ISI administrators regarding Ms. Kent's
actions, Ms. Kent unlawfully retaliated against him . . . . Ms.
Kent also . . . accused him of sexual harassment in retaliation
for his complaints against her . . . ."); id. at ¶ 32 (referring
to Kent's "retaliating against him for his complaints of unlawful
harassment and discrimination").  Clemmons appears to be alleging
in the second instance that HMSA and HFMC either acquiesced in or
ratified Kent's actions or themselves retaliated against him for
complaining about Kent.  See, e.g., id. at ¶ 28.  Even if
Clemmons could be said to have pled a retaliation claim, he
cannot proceed on that theory.

        Title VII provides that an employer may not
"discriminate against any of his employees or applicants for
employment . . . because he has opposed any practice made an
unlawful employment practice by this subchapter, or because he
has made a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing under this
subchapter."  42 U.S.C. § 2000e-3(a) (1972).

        To make out a prima facie case of retaliation, Clemmons
must prove by a preponderance of the evidence that (1) he engaged

in a protected activity; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. See Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996). As with a Title VII discrimination claim, if Clemmons makes out a prima facie case of retaliation, the burden then shifts to Defendants to articulate a legitimate nondiscriminatory reason for their decision. If Defendants meet their burden, Clemmons bears the ultimate burden of demonstrating that the reason given was "merely a pretext for a discriminatory motive." See Ray, 217 F.3d at 1240.

The most obvious failing in Clemmons's purported retaliation claim is the total absence of any evidence of pretext. Even if Clemmons is complaining that HMSA and HFMC should have disciplined Kent, not Clemmons, and that the failure to discipline Kent while terminating Clemmons was retaliatory, Clemmons shows no link evidencing pretext between his termination and Kent's alleged sexual harassment or comments of several years earlier. To the extent Clemmons is complaining that he was really fired in retaliation for having complained about Aquino just a few days before he was fired, then Clemmons must provide evidence of a connection. He provides none, noting only the proximity in time. If this were all that the law required, pretext issues would nearly always proceed to trial. As the law

requires more, Clemmons cannot proceed to trial on any retaliation claim.

        D.     Clemmons Fails To Raise Any Genuine Dispute Of Material Fact As To His Claim For Breach Of Contract.

Clemmons's third cause of action is for breach of contract and/or promissory estoppel. The interpretation of contract language is a matter of law. <u>United States ex rel. IBM Corp. v. Hartford Fire Ins. Co.</u>, 112 F. Supp. 2d 1023, 1033 (D. Haw. 2000).

Clemmons alleges that HMSA breached its contract to treat him fairly and investigate his claims of discrimination.

The Complaint alleges that HMSA distributed material to its employees that guaranteed that employees would be treated fairly:

> 50. Defendant HMSA disseminated express and written statements of employment policies, practices and procedures which it provided to all employees including Mr. Clemmons.

> 51. Defendant HMSA represented both orally and in writing that it would treat employees in a specific, fair, and equitable manner. Specifically, Defendant HMSA promulgated a policy that employees would be treated fairly with regard to sexual harassment, complaints, retaliation, wages and discipline, among others.

> 52. Further, Defendant HMSA expressly and impliedly represented that it would investigate allegations of sexual harassment and misconduct originally raised by Mr. Clemmons in a fair, impartial and

nondiscriminatory manner.

> 53. Defendant HMSA promulgated these
> policies and procedures and made these
> representations in such a manner as to
> manifest its willingness to enter into a
> bargain with its employees, including Mr.
> Clemmons.

Compl. ¶¶ 50-53, ECF No. 1. Clemmons alleges that "HMSA breached

its contract with Mr. Clemmons by its failure to follow its own

practices, policies and procedures with regard to the terms and

conditions of Mr. Clemmons' employment as set forth herein." Id.

at ¶ 55, ECF No. 1. Clemmons further alleges that "Defendants

used a progressive disciplinary policy which implies a contract

with Plaintiff. Defendants contracted with Plaintiff to provide

him a harassment- and discrimination-free workplace by providing

Plaintiff with written policies and requiring that he read and

acknowledge anti-harassment and anti-discrimination policies."

Opposition at 28, ECF No. 87.

Clemmons cites to Kamaka v. Goodsill Anderson Quinn &

Stifel, 117 Haw. 92, 176 P.3d 91 (2008), and Shoppe v. Gucci Am.,

Inc., 94 Haw. 368, 14 P.3d 1049 (2000), for the proposition that

"if an employer issues policy statements or rules, in a manual or

otherwise, and, by its language or by the employer's actions,

encourages reliance thereon, the employer cannot be free to only

selectively abide by it." Opposition at 28, ECF No. 87.

However, Kamaka, Shoppe, and a related line of Hawaii cases that

support this principle are concerned with implicit promises of

job security, not with a general promise to be fair.  See, e.g.,

Kamaka, 117 Haw. at 119, 176 P.3d at 118 (concerned with whether

employee handbook changed at-will employment); Shoppe, 94 Haw. at

385, 14 P.3d at 1066 (same); Kinoshita v. Canadian Pac. Airlines,

Ltd., 68 Haw. 594, 724 P.2d 110 (1986) (concerned with policies

regarding job security and reliance thereon).  The court finds no

authority that an employee handbook or manual promising that an

employer will treat employees fairly constitutes an enforceable

contract.  See Boteilho v. Boteilho, 58 Haw. 40, 42, 564 P.2d

144, 146 (1977) (to be enforceable, a contract must be certain

and definite as to its essential terms).

     Clemmons appears to be relying on two provisions in

claiming breach of contract:

          C.  Sexual Harassment
          The Company expects all employees to be
          treated with professional respect and
          courtesy.  ISI/HFMC prohibits any form of
          sexual harassment in the workplace, whether
          by a supervisor, manager, co-worker, or any
          other employee or consultant.  Those who
          engage in sexual harassment will be subject
          to corrective action up to and including
          termination.

          . . . .

          XIII.  REPORTING VIOLATIONS
          All employees are obligated to report actual
          or suspected violations of this Code of
          Business Conduct (See Exhibit A) or any other
          conduct that appears to be inappropriate or
          constitutes misconduct, to their immediate
          supervisor or manager, or the Compliance and
          Ethics Officer.  There will be no retaliation
          against any employee for reporting an actual

33

> or suspected violation of this Code or other
> irregularity in good faith.

Code of Business Conduct, Pl. Dep. Ex. 5 at 13, ECF No. 52-3.

Even if these provisions were enforceable contractual provisions, a matter this court does not here rule on, they would not, without more than Clemmons has provided to the court, support a breach of contract claim. In citing the sexual harassment provision, Clemmons appears to be arguing that he had a right to have Kent fired. But the provision is clearly aimed as a warning at alleged harassers, not as an enforceable promise to alleged victims that their alleged tormentors will be fired! In citing the "Reporting Violations" provision, Clemmons appears to be arguing that he had a contractual right not to be retaliated against. As discussed earlier in this order, he does not have a viable Title VII claim that he was retaliated against. Even recognizing that the elements of a breach of contract claim differ from the elements of a Title VII claim, the court concludes that Clemmons does not show how he could establish a breach of the "Reporting Violations" provision in the Code of Business Conduct. That is, while using the word "retaliatory" to describe certain actions, he provides no actual evidence that the actions were retaliatory. If he cannot establish retaliation at all, he cannot have a viable claim for breach of contract based on retaliation.

Notably, <u>Kamaka</u>, cited by Clemmons, is inapplicable

here.  In <u>Kamaka</u>, the Hawaii Supreme Court stated, "This court has never recognized an 'implied promise of fair treatment' as a means for altering the at-will status of an employment relationship."  <u>Kamaka</u>, 117 Haw. at 119 n.28, 176 P.3d at 118 n.28.  The Hawaii Supreme Court reviewed the employee handbook and concluded that the procedure for employee evaluation "could not support a finding that the manual contained a specific termination procedure thereby altering Kamaka's at-will status." <u>Id.</u> at 121, 176 P.3d at 120.[9]

Clemmons has conceded that he was an at-will employee, <u>see</u> Motion at 22-23, ECF No. 51, and provides no further authority in his opposition to the contrary, other than the anti-harassment and anti-discrimination policies.  <u>See</u> Opposition at 29, ECF No. 87.  Clemmons's acknowledgement is consistent with the employment application he signed.  The application explained that he was an at-will employee and that handbooks did not change the nature of the at-will employment: "Statements made in handbooks or other policy documents are not guarantees or contracts of employment."  Hawaii Medical Service Association And Subsidiaries Application For Employment, Pl. Dep. Ex. 1 at 4, ECF

_____

[9] "Under the at-will employment doctrine, an employer may terminate an at-will employee at any time for good cause, bad cause, or no cause."  <u>Gonsalves v. Nissan Motor Corp. In Haw., Ltd.</u>, 100 Haw. 149, 172, 58 P.3d 1196, 1219 (2002) (citation omitted).

No. 52-3.[10]

Given the applicable law and the record before the court, the court grants summary judgment to Defendants as to the breach of contract claim.

> E.  Clemmons Fails To Raise Any Genuine Dispute Of Material Fact As To His Claim For Promissory Estoppel.

Clemmons alleges that Defendants breached numerous promises on which he relied. The court grants summary judgment in favor of Defendants on this claim.

In Hawaii, "[a] promissory estoppel may arise as an application of the general principle of equitable estoppel to certain situations where a promise has been made, even though without consideration, if it was intended that the promise be relied upon and was in fact relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice." In re Herrick, 82 Haw. 329, 337, 922 P.2d 942, 950 (Haw. 1996).

The elements of a promissory estoppel claim are: "(1) There must be a promise; (2) The promisor must, at the time he or she made the promise, foresee that the promisee would rely upon

_____

[10] The Hawaii Supreme Court has stated, "To protect against claims of breach of implied contract based on employee handbooks, employers may use 'disclaimers expressly stating that the handbook or manual is not a contract and does not alter the employment at-will relationship.'" Gonsalves, 100 Haw. at 166, 58 P.3d at 1213.

the promise (foreseeability); (3) The promisee does in fact rely upon the promisor's promise; and (4) Enforcement of the promise is necessary to avoid injustice." Id. at 337-38, 922 P.2d at 950-51.

Defendants identify seven alleged promises made to Clemmons and analyze each. See Motion at 27-28, ECF No. 51. Clemmons does not attempt to refute any of their arguments, instead saying generally, "There is a fundamental injustice in refusing to enforce the promises of a workplace free from sexual harassment, retaliation, and discrimination." Opposition at 30, ECF No. 87.

> 1. Kent's Alleged Statement That Clemmons's Job Was Not In Danger.

Clemmons says that Kent assured him that his job was secure. This is not a promise that must be enforced to prevent injustice. In fact, enforcement of this promise would be contrary to public policy. In Gonsalves, the Hawaii Supreme Court held that a promise made by a company executive to an employee that he would retain his job regardless of the findings of a sexual harassment investigation was "unenforceable, and [plaintiff] is unable to maintain a claim for promissory estoppel as a matter of public policy." Gonsalves, 100 Haw. at 166, 58 P.3d at 1213. Enforcement of such a promise would hinder the employer's ability to appropriately respond to misconduct by its employees. Id. Moreover, Clemmons has admitted that he did not

believe Kent's assertion relating to his job security.  See
Motion at 31-32, ECF No. 51; Pl. Dep. at 292:9-11, ECF No. 52-2.
As Clemmons could not have justifiably relied on a statement he
did not believe, this court does not enforce any promise
regarding his job security.

      2.    Kent's Alleged Statement That Clemmons Was
           Not Being Targeted.

     Clemmons says Kent told him that he was not being
targeted.  This is not the type of clear and definite promise for
which Clemmons can seek relief under a theory of promissory
estoppel.  A "promise" is "a manifestation of intention to act or
refrain from acting in a specified way, so made as to justify a
promisee in understanding that a commitment has been made. . . .
[A] promisor manifests an intention if he believes or has reason
to believe that the promisee will infer that intention from his
words or conduct."  Kahale v. ADT Auto. Servs., Inc., 2 F. Supp.
2d 1295, 1301 (D. Haw. 1998) (internal citation and quotation
marks omitted).  Kent's statement is not a promise about future
events, but a reassurance about past events.  Clemmons admits
that Kent's statement arose when Clemmons "report[ed] to her
feeling that [he] was being targeted," and that Kent "was
commenting on these events that [he] had brought to her."  Pl.
Dep. at 306:8-13, ECF No. 52-2.  Clemmons does not identify a
specific promise about future events in this regard.
Additionally, there is no indication that Clemmons relied on

38

Kent's statements, as Clemmons has testified that he "couldn't believe anything [Kent] said anymore." <u>Id.</u> at 108:23-25.

### 3. HMSA's Alleged Invitation To Clemmons To A Party Recognizing His 15 Years Of Service.

Clemmons says HMSA invited him to a celebration of his 15 years of service. Clemmons says this alleged invitation was a promise. <u>Id.</u> at 307:20-21. There is no evidence that HMSA broke this alleged promise; it appears that Clemmons could not attend because of work responsibilities. <u>Id.</u> at 307:8-10. He admits that he asked Kent for permission to attend, then did not raise the matter again. <u>Id.</u> at 307:11. Even if this were a promise, enforcing it is not essential to prevent injustice.

### 4. Kent's Alleged Statement That She Would Wait For Clemmons Before Starting Monthly Staff Meetings.

Clemmons says that Kent promised to wait for him before starting staff meetings. A court enforces a promise where "a refusal to enforce it would be virtually to sanction the perpetuation of fraud or result in other injustice." <u>In re Herrick</u>, 82 Haw. at 337, 922 P.2d at 950 (quoting <u>Motonaga v. Ishimaru</u>, 38 Haw. 158, 163 (Haw. Terr. 1948)). Starting meetings before all arrive hardly seems akin to fraud or injustice. At most, Clemmons felt left out of the loop. <u>See</u> Pl. Dep. at 309:2-312:14, ECF No. 52-2. Furthermore, as noted above, as Clemmons testified that he no longer believed anything Kent said, he appears not to have relied on her alleged promise. <u>Id.</u> at

108:23-25, ECF No. 52-2.

5. <u>Alleged Promise Of A 3% Annual Pay Raise.</u>

Clemmons testified that he believed that because his retirement benefit statement "assumed" a 3% annual increase, he was promised those raises. <u>See</u> <u>id.</u> at 313:8-11. However, an "assumed" pay raise for the sake of a calculation is not a clear, definite promise made by any Defendant. Clemmons's position would keep employers from providing retirement benefits projections! To the extent Clemmons relied on the projection, his reliance was unjustified.

6. Alleged Assurance That Clemmons Was Not In
<u>Trouble For Being Backed Up With Work.</u>

Like Clemmons's claim that Defendants promised that he was not being targeted, any promise that Clemmons was not in trouble for being backed up with work is too vague to be an actionable promise. <u>See</u> <u>Kahale</u>, 2 F. Supp. 2d at 1301.

7. Drug Company Representative's Alleged Promise
<u>To Bring Clemmons Lunch.</u>

The final alleged promise, that Clemmons was denied lunch as promised by a drug company representative, is clearly not a promise by Defendants. Clemmons acknowledges that the promise was made by a drug company representative not employed by any Defendant. <u>Id.</u> at 304:16-17. Clemmons appears to blame Kent, because "she was standing right next to him with a smile[,]" <u>id.</u> at 304:12-15, but the court fails to see how her

40

presence is relevant.  Moreover, it can hardly be said that the enforcement of a promise of a free lunch is necessary to prevent an injustice.

### 8.  Additional Statements.

Clemmons makes passing reference in his opposition to other alleged statements not mentioned in his Complaint as part of his promissory estoppel claim: "Mr. Clemmons was a member of the clinic, yet was excluded from the meetings, his civil rights were violated when he was called names and made fun of for his disability.  Mr. Clemmons was promised that his complaints would be investigated in a fair manner.  Yet when he complained, he was ridiculed."  Opposition at 30, ECF No. 87.  No promise is discernible in alleged statements that (1) excluded Clemmons from meetings, (2) violated his civil rights, and (3) called him names.  Even Clemmons's reference to a promise to investigate his complaints does not include sufficient detail to support a promissory estoppel claim.  If Clemmons is merely repackaging his argument that the employee handbook created a promise, Clemmons's claim is uncognizable for the reasons detailed earlier in this order.  Nor does Clemmons indicate how or when he detrimentally relied on the alleged promise.  Did he rely on it when he first started working for Defendants?  If so, how would he have been better off had he not relied on it?  There is too little presented to the court to permit this allegation to support the

claim.

V.        CONCLUSION.

        For the foregoing reasons, the court GRANTS Defendants'
motion for summary judgment.  The clerk of the court is directed
to enter judgment pursuant to this order and to close the case.

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, December 29, 2011.



                          /s/ Susan Oki Mollway
                         Susan Oki Mollway
                         Chief United States District Judge